IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LARRY DEAN GARRETT, JR., ) <br> Reg. No. 34790-001 ) <br> ) <br>    Plaintiff, ) <br> ) <br> v. ) <br> ) <br> U.S. MARSHALS SERVICE, *et al*., ) <br> ) <br>    Defendants. ) | CIVIL ACTION NO. <br> 2:17-CV-470-ECM-JTA <br> [WO] |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

### I.  INTRODUCTION[1]

This action under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), is before the court on an amended complaint filed *pro se* by Plaintiff Larry Dean Garrett, Jr.  Doc. 28.  Garrett alleges he suffered serious injuries when officers with the United States Marshals Service ("USMS") used excessive force in effecting his arrest at a mobile home in Eufaula, Alabama, on April 15, 2016.  *Id.* at 2–3.  Named as Defendants by Garrett are two of the officers involved in his arrest: USMS Inspector David Onofry and USMS Supervisory Deputy Ernest Williams.  *Id*.  Garrett seeks $50,000 in compensatory damages and $25,000 in punitive damages against each Defendant in his individual capacity.  *Id*. at 4.

---

[1] References to document numbers are to the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the Clerk. Pinpoint citations are to the page of the electronically filed document in the court's CM/ECF filing system, which may not correspond to pagination on the "hard copy" of the document presented for filing.

Defendants filed a special report and supporting evidentiary materials addressing the allegations in Garrett's amended complaint. Doc. 50. Defendants maintain they did not use excessive force in arresting Garrett, they did not cause Garrett's injuries, and the record establishes Garrett's injuries were incurred the day before his arrest when Garrett was beaten by three men in Birmingham who attacked him for molesting a young boy. *Id*. at 1–3, 11–12. Thus, Defendants contend there is no genuine dispute as to any material fact that would allow a reasonable factfinder to return a verdict in Garrett's favor on his claim that Defendants used excessive force in effecting his arrest. *Id.* Pursuant to the directives in orders entered in this case (*see* Doc. 51 at 2–3), the court now treats Defendants' special report as a motion for summary judgment. Upon consideration of this motion and the other materials in the record, the court concludes that Defendants' motion for summary judgment (Doc. 50) is due to be granted.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotation marks omitted); Fed. R. Civ. P. 56(a). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying

2

those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To shoulder this burden, the moving party can present evidence to this effect. *Id.* at 322–23. Or it can show that the nonmoving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof. *Id.*

If the moving party meets its burden, the nonmoving party must "go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995); *see also Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor. *See Greenberg,* 498 F.3d at 1263.

General, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Summary judgment requires the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a
3

showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990).

A court ruling on a motion for summary judgment must draw all justifiable factual inferences from the evidence in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  FACTUAL BACKGROUND

**A.  Garrett's Claims**

Garrett claims he suffered serious injuries as a result of excessive force used by Defendants Onofry and Williams when they arrested him at a mobile home in Eufaula, Alabama, on April 15, 2016. Doc. 28 at 2–3. At the time of his arrest, Garrett was a fugitive under investigation for sexually abusing children and was wanted on a warrant for violating the Sex Offender Registration and Notification Act ("SORNA"). Doc. 50-9 at 3; Doc. 50-10 at 3. On April 15, Onofry and Williams, who were working with the USMS Gulf Coast Regional Fugitive Task Force, received information that Garrett had recently

left Birmingham and gone to the Eufaula residence of his aunt, Katenia Miller. Doc. 50-9 at 3; Doc. 50-10 at 3. Onofry and Williams, accompanied by another deputy from the USMS, went to Miller's residence, a mobile home, to arrest Garrett. Doc. 50-9 at 3–4; Doc. 50-10 at 3. After Onofry and Williams told Miller why they were there, Miller told them Garrett was sitting on a bed in the master bedroom and to "go in and get him." Doc. 50-9 at 4; Doc. 50-10 at 4. Defendants shouted, "Police, come out with your hands up." Doc. 50-10 at 4. When there was no response, Defendants entered the mobile home to make the arrest. *Id.*

> In his amended complaint, Garrett alleges that the following ensued:
>
> Inspector Onofry came into the room of the trailer I was residing in and pulled me out the closet and hit me across the face with a hard metallic object. Then as I held my hand up to shield my face, I was struck again. After being snatched into the bedroom and struck a few more times, I couldn't see because my eyes began to swell. I continued to shield my face and felt myself being dragged outside the trailer.

Doc. 28 at 3.

> Garrett further alleges:
>
> After being dragged out the trailer, I was dropped on the ground on my face down as I notice[d] Senior Inspector Williams waiting. Once I was down on the ground and handcuffed, Williams kicked my legs apart and then kicked me in the groin. He then stepped on my scrotum before stating, "so you like drawing pictures of little boys, huh?" I could barely make out the Marshals around me through my swollen eyes.

Doc. 28 at 3.

To his amended complaint, Garrett attaches two pages of medical records from Medical Center Barbour, a hospital in Eufaula, to demonstrate the injuries he attributes to the excessive force used by Onofry and Williams during his arrest. Doc. 28 at 6–7. The

medical records reflect that Garrett was admitted and discharged from the hospital on April 15, 2016, and indicate Garrett had sustained head injuries (specifically, contusions, hematoma, laceration, pain, and swelling); chest injuries (to his clavicle, xyphoid, and sternal areas); and injuries to his foot and knee. *Id*. The physician notes in the medical records state that Garrett's injuries occurred on April 14, 2016, and that the "mechanism of injury" was "[a]lleged assault: with fists, shoes/feet while getting kicked, by unknown person(s), 'some dude(s).'"[2] *Id.* at 7.

Also attached to Garrett's amended complaint is a photograph of Garrett with a badly swollen face, including substantial swelling around his eyes, again to demonstrate the injuries Garrett attributes to the Defendants' actions in his arrest.[3] Doc. 28 at 8.

**B. Defendants' Evidentiary Materials**

Defendants deny Garrett's claim they used excessive force in arresting him and also deny Garrett's specific allegations about their actions during his arrest. Doc. 50. Defendants argue Garrett's allegations are blatantly contradicted by the evidentiary materials included with their special report and that these materials, including Garrett's own sworn testimony at his criminal trial in December 2017, demonstrate that the injuries about which Garrett complains were incurred on April 14, 2016—the day before

---

[2] Garrett includes only part of the medical records. With their special report, Defendants attach additional pages from Garrett's medical records from Medical Center Barbour. Doc. 50-11. Garrett's hospital discharge summary from April 15, 2016, indicates that he suffered from contusions and soft tissue swelling throughout his face, facial bone fracture, dental fracture, and nasal bone fracture. *Id.* at 5, 10.

[3] Under Fed. R. Civ. P. 10 (c), the medical records and photograph attached by Garrett to his amended complaint are part of the amended complaint for all purposes. *Solis-Ramirez v. U.S. Dept. of Justice*, 758 F.2d 1426, 1430 (11th Cir. 1985).

Defendants arrested Garrett—when Garrett was beaten by three men in Birmingham who attacked him for molesting a young boy. Doc. 50 at 1–2.

The evidentiary materials submitted by Defendants show that on October 3, 2016, (around five months after Garrett's arrest by Defendants), a federal grand jury in the Northern District of Alabama indicted Garrett on one count of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e). Doc. 50-1. The case came to trial in December 2017. Doc. 50-5. Garrett, assisted by standby counsel, represented himself. *Id*. Garrett also testified in his own behalf. Doc. 50-4. On December 11, 2017, the jury found Garrett guilty of the production of child pornography as charged in the indictment. Doc. 50-2.

### 1. *Anthony Jones's Testimony at Garrett's Criminal Trial*

The production of child pornography charge against Garrett concerned a video on a secure digital card ("SD card")[4] showing a five-year-old boy performing oral sex on Garrett. Anthony Jones testified at Garrett's trial that Garrett routinely burned movies on CDs and sold them to others in their Birmingham neighborhood. Doc. 50-3 at 7. On April 13, 2016, Garrett had no CDs, so he burned some movies to an SD card and gave the card to Jones. *Id*. That night, Jones put the SD card in his cell phone intending to watch the movies. *Id.* at 8. Jones opened a file and saw a video of Garrett masturbating and making a young boy perform oral sex on him until he ejaculated on the boy's face. *Id.* at 9. Jones

---

[4] An SD card is a memory card used in portable electronic devices. *See Solo v. SD-3C LLC*, 751 F.3d 1081, 1084 (9th Cir. 2014) (noting that "SD cards are the dominant form of flash memory card on the market, and are widely used in consumer electronics devices such as cellular phones and digital cameras").

recognized the boy in the video because he was close with the boy's family, who lived in the same Birmingham apartment complex as Jones, the Valley Brook Apartments. *Id.* at 7–8. Jones contacted the boy's family members and showed them the video. *Id.* at 10–11. The family members got extremely upset and called the Birmingham police. *Id*. at 11.

### 2.  *Garrett's Testimony and Statements at His Criminal Trial*

Garrett took the stand at his criminal trial, where his standby counsel conducted his direct examination. Garrett testified that around midnight on April 13–14, 2016, Jones lured him to an apartment in the Valley Brook Apartments, where Jones and two other men severely beat him in retribution for his molestation of the boy seen on the SD card. Doc. 50-4 at 20, 33–35. According to Garrett, Jones told him that a DVD he had given him didn't work and then brought him to the apartment on the pretext of demonstrating it didn't work. *Id.* at 20, 33. Jones took Garrett to the back of the apartment, plugged in the TV, turned it on, and ejected the DVD. *Id.* at 34. According to Garrett, Demetrius Holmes (who was related to the minor in the video) and an unknown man with dreadlocks entered the apartment. *Id.* Garrett testified that Jones then came from behind and grabbed him and held up his arms. *Id.* Garrett testified that Demetrius Holmes started punching him in the face, and his nose began bleeding. *Id*. Garrett testified that Jones pushed him onto the floor and kicked him in the back, and then all three men "stomp[ed] [him] on the floor." *Id.* Garrett stated that Jones urinated on him while he lay bleeding on the floor. *Id.* Garrett testified that Jones then pulled out a gun and told Garrett that if he told anyone what happened, he would kill him and his family. *Id.* Garrett attributed the beating he received

to the boy's family's outrage over the video of the boy being molested by Garrett.[5] *Id*. at 35.

Garrett testified that, after the beating, he went to his cousin's apartment in the same apartment complex. Doc. 50-4 at 20, 35. From there, he called his aunt Katenia Miller, and she came to Birmingham and picked him up and took him to her place in Eufaula. *Id.* at 20. Garrett testified that, then, "the [M]arshals came. They got me in Eufaula and took me to the medical center from my aunt's house, took me to the medical center." *Id*. at 36.

At Garrett's criminal trial, Garrett's standby counsel introduced a photograph of Garrett with a battered and badly swollen face, and established through Garrett's testimony that the photograph (Doc. 50-6) was taken at the hospital in Eufaula on April 15, 2016. Doc. 50-4 at 4–5. Standby counsel asked Garrett, "[W]hy were you in the Eufaula Hospital, Eufaula Medical Center?" Doc. 50-4 at 5. Garrett testified, "I had been assaulted by some guys in Valley Brook apartment." *Id*. Standby counsel then asked: "One of those guys, was that Anthony Jones who testified here the other day?" *Id*. Garrett answered, "Yes, sir." *Id.* The very same photograph introduced by Garrett at his criminal trial to show the injuries he testified were caused by Jones and "some guys" in the Valley Brook Apartments in Birmingham on April 14, 2016 (Doc. 50-6) is attached by Garrett to his amended complaint in this *Bivens* action (Doc. 28 at 8) to demonstrate the injuries Garrett now says were caused by Defendants when they arrested him on April 15, 2016. Earlier in his trial,

---

[5] In his opening statement at the trial, Garrett told jurors that "[t]here was a time in the victim's apartment, which I'm going to show you evidence, where I was assaulted. I was brutally beaten, urinated on, ejaculated on by a couple of the offenders[.]" Doc. 50-5 at 8.

9

when cross-examining Jones, Garrett himself sought to introduce the same photograph, telling the court, "I just want to clarify that it is me in the picture, Your Honor, and that's what the witness [i.e., Jones] did."[6] Doc. 50-3 at 22. As indicated above, the photograph was admitted in evidence during standby counsel's direct examination of Garrett. Doc. 50-4 at 4–5.

### 3. Birmingham Police Report

With their special report, Defendants produce a copy of a report by the Birmingham Police Department created on April 14, 2016, detailing police officers' response to a phone call about the video of Garrett molesting a five-year-old boy at the Valley Brook Apartments in Birmingham. Doc. 50-7. The police report states that, upon the officers' arrival at the Valley Brook Apartments, a woman told the officers that her son was possibly sexually assaulted and that the suspect, Garrett, may have been physically assaulted by some men inside her apartment. *Id.* at 5. A responding officer "observed a large amount of blood over the floor and walls of the apartment." *Id.* Another responding officer spoke with Garrett on the phone, and Garrett told the officer he was in "serious pain" but would not disclose his location. *Id.*

### 4. Defendants' Affidavits

Defendants submit affidavits in which they adamantly deny Garrett's allegations of excessive force. Docs. 50-9, 50-10. Defendant Williams states he entered the mobile home in Eufaula on April 15, 2016, carrying a bullet-resistant shield, followed by Defendant

---

[6] When Garrett sought to cross-examine Jones specifically about the beating administered in Birmingham, Jones asserted his Fifth Amendment right to remain silent. Doc. 50-3 at 14.

Onofry and Task Force Investigator Jeremy Adkins. Doc. 50-10 at 4. Onofry and Adkins entered the master bedroom and discovered Garrett hiding in the closet under a pile of clothes curled around four rifles and shotguns. Doc. 50-9 at 4; Doc. 50-10 at 4. Onofry and Adkins removed Garrett from the closet, placed him on the floor, and handcuffed him. Doc. 50-9 at 4–5. They then removed him from the mobile home and placed him outside on the driveway. *Id*. Onofry and Williams state that at no time did they or any other officer strike, kick, or beat Garrett. Doc. 50-9 at 5; Doc. 50-10 at 4. Onofry specifically states:

> I have read Garrett's complaint where he alleges that I struck him multiple times in the face with a hard metallic object. This allegation is completely false. At no time during my arrest of Garrett did I, or any other officer, strike, beat, or kick him. I did not even carry a flashlight, baton, or any other metallic object when I arrested Garrett. The only force that I used on him was the minimal force necessary to grab him and remove him from the closet containing the guns and to pull his arm behind his back to handcuff him.

Doc. 50-9 at 5. Williams specifically states:

> I have read Garrett's complaint where he alleges that I kicked him in the groin and stepped on his scrotum when he was handcuffed and lying face down on the ground outside the mobile home. This allegation is completely false. At no time during our arrest of Garrett did I, or any other officer, strike, beat, or kick him. In addition. When we removed him from the mobile home, we placed him in a sitting position in the driveway, not face down.

Doc. 50-10 at 5.

Both Onofry and Williams state they could see obvious, preexisting trauma to Garrett's face and head when he was arrested, and they immediately requested medical assistance for him. Doc. 50-9 at 5; Doc. 50-10 at 5. At the scene, they took photographs of Garrett's injuries to document his condition. Those photographs are attached as exhibits to Onofry's affidavit. Doc. 50-9 at 14–15. Onofry states that, while they were waiting for

medical personnel to arrive, Garrett told him he had been beaten by "approximately four men" in Birmingham the previous day over a misunderstanding about the sale of DVDs. *Id*. at 5. Emergency medical personnel arrived at the scene and transported Garrett to the Medical Center Barbour in Eufaula for evaluation and treatment. Doc. 50-9 at 5; Doc. 5-10 at 4.

### 5. *Katenia Miller's Affidavit*

With their special report, Defendants also produce an affidavit from Garrett's aunt, Katenia Miller. Doc. 50-12. Miller states that Garrett called her on April 14, 2016, and asked her to pick him up in Birmingham. *Id.* at 2. She picked Garrett up at a Birmingham gas station. *Id.* According to Miller, when she picked Garrett up, she saw he had been badly injured. *Id.* His eyes were swollen shut, his lip was bleeding, and he was covered in blood. *Id.* Garrett also complained of injuries to his chest, back, and head. *Id*. Miller stated Garrett told her he had been jumped by some guys and their brothers over a dispute about money. *Id.* Miller drove Garrett to her mobile home in Eufaula, cleaned him up, and put band-aids on his cuts. *Id*. The following day, Defendants came to her residence and arrested Garrett. *Id.* at 3. Miller avers:

> I did not see any officer strike or beat Garrett during his arrest. I saw him handcuffed in the driveway before the ambulance came and the injuries he had were the same injuries he had the day before when I picked him up.
>
> I understand that he is now claiming that the Marshals caused his injuries when they arrested him. This is false.

Doc. 5-12 at 3.

## IV.   DISCUSSION

In claiming that Defendants used excessive force in effecting his arrest, Garrett asserts that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.  Doc. 28 at 2.  However, where, as in Garrett's case, an excessive force claim arises from an arrest of a nonincarcerated citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Thus, this court analyzes Garrett's excessive force claim under the Fourth Amendment.

"[C]laims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]"  *Graham*, 490 U.S. at 395. "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]"  *Id.* at 397.  The reasonableness test is not mechanically applied, but instead depends on the facts and circumstances of each particular case.  The Eleventh Circuit's analysis of this question includes the following *Graham* factors: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  *See, e.g., Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 738 (11th Cir. 2010) (citing the *Graham* factors).  Other factors relevant to the resolution include "the need for the application of force, the relationship between the need and the amount of force

13

used, and the extent of the injury inflicted." *Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014) (citation omitted, alteration accepted).

While, as stated above in this Recommendation, the summary judgment standard typically means drawing all factual inferences in a light most favorable to the nonmoving party, *Anderson*, 477 U.S. at 255, where the nonmoving party's version of the facts is blatantly contradicted by the record, "so that no reasonable jury could believe it," the court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment, *Scott*, 550 U.S. at 380. The undersigned finds this to be the case here regarding the factual issue of whether the injuries about which Garrett complains resulted from actions of the Defendants when effecting his arrest on April 15, 2016. In his allegations in his amended complaint, Garrett asserts that Defendants severely beat him when effecting his arrest, and he submits medical records and a photograph purporting to demonstrate the injuries caused by Defendants. Defendants deny that they beat Garrett or that they caused the injuries about which he complains. But besides Defendants' denials, the record contains evidentiary materials, in the form of Garrett's testimony and his statements at his criminal trial and the photograph introduced by Garrett at that trial, that have the effect of so utterly discrediting Garrett's factual assertions in his amended complaint that no reasonable jury could believe the assertions in his amended complaint. This court will not rely on the evident fictions in Garrett's amended complaint where the record shows that Garrett, in his criminal case, testified under oath that he was severely beaten by Anthony Jones and two other men on April 14, 2016; testified that the beating by Jones and the two other men caused the injuries that led to his admission and treatment at the hospital in

Eufaula on April 15, 2016; and introduced a photograph at his criminal trial to demonstrate the injuries resulting from the beating by Jones and the two other men where he presents the very same photograph with his amended complaint in this *Bivens* action purporting to show the injuries he now says were caused by Defendants when they arrested him. With this civil matter, Garrett is trying to falsely attribute to Defendants the injuries he suffered at the hands of others in the April 14, 2016, beating in Birmingham.

Because the record utterly discredits Garrett's allegations in his amended complaint that his injuries were caused by Defendants, there can be no genuine dispute of material fact on the question of whether Defendants' actions caused Garrett's injuries. Thus, as Defendants correctly maintain, there is no genuine dispute as to any material fact that would allow a reasonable factfinder to return a verdict in Garrett's favor on his claim that Defendants used excessive force—i.e., acted unreasonably under the Fourth Amendment— in effecting his arrest.

Garrett's allegation that Defendant Williams kicked him in the groin and stepped on his scrotum in effecting his arrest is not necessarily encompassed in the injuries reflected in the medical records and photograph that Garrett represents as showing the injuries caused by Defendants. In making this conclusory allegation regarding Williams, Garrett does not assert that he sustained any injuries or even experienced any pain as result of Williams's actions. Indeed, Garrett's amended complaint and the medical records and the photograph he attaches focus entirely on the serious injuries allegedly resulting from other actions by the Defendants in effecting his arrest. Thus, as to these specific actions by Williams, even if Garrett's allegations are taken as true, Garrett establishes at most the use

of *de minimis* force by Williams, which cannot constitute a Fourth Amendment violation. *Nolin v. Isbell*, 207 F.3d 1253, 1256 (11th Cir. 2000).

Under the *de minimis* principle, a minimal amount of force *and* injury will not sustain a claim of excessive force. *Nolin*, 207 F.3d at 1258 (emphasis added). "The minor nature of [an] injury [can] reflect[ ] that minimal force was used. . . ." *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997) (in the context of handcuffing); *see also Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002) (describing the type of injury as a way of showing that force was not *de minimis* ). The Eleventh Circuit has found *de minimis* force in the following circumstances: when an officer put a foot on the face of the plaintiff, who was face down on the pavement, after he asked why he was being arrested, *Crosby v. Monroe County*, 394 F.3d 1328, 1334–35 (11th Cir. 2004); when the plaintiff was grabbed and shoved a few feet against a vehicle while pushing a knee against his back and pushing his head into the van and searching the groin area in an uncomfortable way, *Nolin*, 207 F.3d at 1258 n.4; when the plaintiff's legs were kicked apart, requiring him to raise his arms, and pulling his wallet from his pants, *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997); and when tight handcuffs were on the plaintiff's wrists for twenty minutes causing pain and skin abrasions, *Gold*, 121 F.3d at 1446. *See also Bryan v. Spillman*, 217 F. App'x 882, 886 (11th Cir. 2007) (finding the "temporary pain" and "no treatment" and "no lasting injury" of a rough search of the genitals, and pushing a defendant against a car and holding his head down, to be *de minimis* ). Garrett's conclusory allegation regarding Williams's specific actions establishes no more than the use of *de minimis* force by Williams, which does not constitute a Fourth Amendment violation.

For the reasons set forth above, the court concludes that Garrett has not presented sufficient evidence of excessive force under the Fourth Amendment to survive summary judgment.

## V.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. Defendants' motion for summary judgment (Doc. 50) be GRANTED.

2. Judgment be GRANTED in favor of Defendants.

3. This case be DISMISSED with prejudice.

It is further

ORDERED that the parties shall file any objections to this Recommendation by **March 25, 2021**. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's findings and recommendations under 28 U.S.C. § 636(b)(1) shall bar a party from a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1. *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982*). See also Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 10th day of March, 2021.

                                                <u>/s/ Jerusha T. Adams</u>
                                                JERUSHA T. ADAMS
                                                UNITED STATES MAGISTRATE JUDGE